UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| TRACY MORTON, on behalf of Herself ) <br> and All Others Similarly Situated, ) <br> ) <br> Plaintiff, ) <br> ) <br> ) <br> v. ) <br> ) <br> THE VANDERBILT UNIVERSITY, ) <br> ) <br> Defendant. ) | No. 3:13-01012 <br> Judge Sharp |

## MEMORANDUM

The parties have tentatively settled this class action under the Worker Adjustment and Restraining Notification Act ("WARN Act"), 29 U.S.C. § 2101 *et seq.*, subject to resolution of the following question:

> When did the 279 Vanderbilt University employees who received notice on or about September 17, 2013, that their jobs would be eliminated on November 16, 2013, suffer an "employment loss" within the meaning of the WARN Act?

That question is presented in the context of Defendant's Motion for Summary Judgment, which is based upon undisputed facts. For the reasons that follow, the Court finds that the employment loss occurred on September 17, 2013, and, therefore, Defendant's Motion will be denied.

## I. Facts

For purposes of Defendant's Motion for Summary Judgment, the parties have stipulated to the following facts:

1. Between approximately September 17 and 19, 2013, Vanderbilt met with 279 employees and provided them with individualized letters notifying them that their positions would be eliminated

1

60 days following the date of their notification.

2. The letters stated that the employees' positions would be eliminated in 60 days on November 16, 2013, that they would "remain employed" but be on a "paid leave" for the 60-day period, and that they were no longer required to report to work and could use the 60-day leave period to seek other employment. The only difference in the letters the employees received relates to the separation benefits for which the employees would be eligible.

3. On September 17, 2013, Vanderbilt sent a letter to the Tennessee Department of Labor and Workforce Development giving notice of reductions in force at the Vanderbilt University Medical Center.

4. Vanderbilt provided the supervisors, who would inform the employees that their jobs were being eliminated, with training materials.

5. Vanderbilt Human Resources prepared and disseminated written training or guidance materials to those notifying the employees of the elimination of their positions. These written materials were entitled "A Guide for Leaders" with at least three subtitles: (1) "Workforce Restructuring and Reduction in Force (RIF);" (2) "Leading through the Transition: Managing Stress for You and Your Employees;" and (3) "Questions & Answers for Managers to Use in E2E RIF Discussions."[1]

6. Additionally, these employees were told they should gather their personal belongings and return all Vanderbilt property (identification badges, laptop computers, cell phones and pagers, etc.). They were then taken to meet with someone to discuss career transition counseling, following

---

[1] E2E refers to "Evolve to Excel" which was Vanderbilt's name for the financial reduction project that necessitated the job eliminations.

which, they were to leave campus.

7. For any employees who did not have transportation, Vanderbilt provided pre-paid taxi vouchers following the career counseling.

8. These employees' Vanderbilt identification cards and email accounts were typically deactivated on the same day that the employees were informed of Vanderbilt's decision to eliminate their positions.

9. These employees were told not to return to work and that it would be inappropriate to come to their work areas to socialize or visit.

10. These employees remained on Vanderbilt's payroll and received their full pay and benefits on their regular pay dates for sixty (60) days after receiving the notice.

11. If any of these employees found employment elsewhere during the sixty (60) day period, they were not required to report that information to Vanderbilt, and they continued to be paid by Vanderbilt through the full sixty (60) days.

In addition to the foregoing, another undisputed fact is necessary to place the question to be decided in context. The lay-off announced by the September 17-19, 2013 letters was the second round of mass layoffs at Vanderbilt that year, with the first round occurring on or around July 1, 2013, when close to two hundred employees were informed that they were being terminated.[2]

## II. Defendant's Motion for Summary Judgment

Under the WARN Act, an employer of 100 or more employees is generally required to provide at least 60 days written notice to affected employees before a mass layoff may occur. 29

---

[2] At the hearing on the Motion for Summary Judgment, Vanderbilt stipulated that the combined total of the two lay-offs exceeded 500 employees for purposes of the WARN Act's aggregation provision.

U.S.C. § 2102(a)(1). A "mass layoff" includes a reduction in force, which is not the result of a plant closing, that results in an employment loss at a single site of employment during any 30-day period and involves at least 500 full-time employees. 29 U.S.C. § 2101(a)(3). The Act also contains an aggregation provision that allows separate layoffs to be counted together for purposes of the 500 employee threshold by providing:

> in determining whether a plant closing or mass layoff has occurred or will occur, employment losses for 2 or more groups at a single site of employment, each of which is less than the minimum number of employees specified in section 2101(a)(2) or (3) of this title but which in the aggregate exceed that minimum number, and which occur within any 90-day period shall be considered to be a plant closing or mass layoff unless the employer demonstrates that the employment losses are the result of separate and distinct actions and causes and are not an attempt by the employer to evade the requirements of this chapter.

29 U.S.C. § 2102(d).

The aggregation rule is important in this case because the class consists of the employees who received letters in early July 2013, not those who received letters on or around September 17, 2013. Plaintiff's class Complaint is premised on the notion that they should have received notice in accordance with the WARN Act, but did not. The viability of this contention hinges on whether the employees involved in the second round of lay-offs suffered an "employment loss" in September 2013, or November 2013, because the former date would place the layoffs within the 90-day window, while the latter date would not.

Having considered the matter and the arguments of the parties, the Court finds that the employees in question suffered an employment loss in September 2013. That conclusion is supported by the language of the WARN Act, the implementing regulations, and Sixth Circuit law under the WARN Act. It also in keeping with the remedial purpose of the statute.

4

The Court must "begin 'where all such inquiries must begin: with the language of the statute itself.'" Caraco Pharm. Lab., Ltd. v. Novo Nordisk A/S, 132 S.Ct. 1670, 1680 (2012) (quoting United States v. Ron Pair Ent., Inc., 489 U.S. 235, 241 (1989)). "Employment loss" (with exceptions not relevant here) is defined in the Warn Act as "(A) an employment termination, other than a discharge for cause, voluntary departure, or retirement, (B) a layoff exceeding 6 months, or (C) a reduction in hours of work of more than 50 percent during each month of any 6-month period[.]" 29 U.S.C. § 2101(a)(6). Only the first scenario is potentially applicable here – employment termination.

"Employment termination," and more specifically "termination," is not defined in the WARN Act. "When a term goes undefined in a statute, [a court] give[s] the term its ordinary meaning." Taniguchi v. Kan Pacific Saipan, Ltd., 137 S. Ct. 1997, 2002 (2012).

"'Termination' is defined as . . . 'the act of terminating or the condition of being terminated.'" CBS Inc. v. Prime Time 24 Joint Venture, 245 F.3d 1212, 1223 (11th Cir. 2001) (quoting American Heritage College Dictionary 1399 (3d ed. 1993)). "The word 'terminate' ordinarily means 'put an end to,'" Mac's Shell Serv. Inc. v. Shell Oil Prod. Inc, 599 U.S. 175, 182 (2010) (quoting Websters New International Dictionary 2605 (2d ed. 1957)), or "'to bring to an end,'" Adams v. Anheuser-Busch Co., Inc., 758 F.3d 743, 748 (6th Cir. 2014) (quoting Webster's New Collegiate Dictionary (1975)).

Vanderbilt clearly put an end (and brought an end) to the employment relationship in September 2013. It was then that employees were (a) informed that their employment was over (although they would receive 60 days of "paid leave" and benefits); (b) instructed to clean out their workstations; (c) required to return all Vanderbilt property (including their identifications badges,

which were promptly deactivated); (d) instructed to leave the campus; and (e) told not to return.

This Court's conclusion that the employment loss occurred in September 2013 is also in keeping with the applicable regulations. After tracking the three types of "employment loss" specified in the statute, the regulations provide:

> Where a termination or a layoff . . . is involved, an employment loss does not occur when an employee is reassigned or transferred to employer-sponsored programs, such as retraining or job search activities, as long as the reassignment does not constitute a constructive discharge or other involuntary termination.

20 C.F.R. 639.3(f). Vanderbilt has presented no evidence to suggest that its brief discussions with the employees when they were told to vacate the campus remotely resembles a reassignment or transfer to a retraining program as contemplated by the regulations.

This is not to suggest that retraining or job search activities are necessarily required to avoid WARN Act liability. In fact, as Vanderbilt points out, the Department of Labor's comments to the regulations "note that neither WARN nor the regulations dictate the nature of work to be performed – or whether work must be performed – during a period of employment after notice of an impending plant closing[.]" 54 Fed. Reg. 16,048. It is to suggest, however, that, after the "little brief seminar on how to go look for a job" (as Vanderbilt's counsel characterized it at the hearing), the 279 individuals were left to their own devices. At that time, in the words of the comments on which Vanderbilt relies, there was "a permanent cessation of the employment relationship." Id. at 16,047.

The plain and ordinary meaning of the statute and regulations aside, the conclusion that an employment loss occurred in September 2013 is in keeping with the Sixth Circuit's observations in Kildea v. Electro-Wire Prod., Inc., 144 F. 3d 400 (6th Cir. 1998). There, the court noted that (a) employment loss under the WARN Act applies only to "an 'affected employee'"; (b) "it is logical that an 'affected employee' must be an 'employee' in order to suffer an employment loss"; and (c)

6

"[t]he regulations define an 'employee' as an individual who is either (1) actively working or (2) temporarily laidoff, or on leave, with a reasonable expectation of recall." Id. at 405 n.6 (citing 20 C.F.R. § 639.3(a)(1)). Here, of course, the "affected employees" were not actively working after September 2013, nor did they have any expectation at all of being recalled. In fact, it is undisputed that, as of September 2013, they were never going to work again at Vanderbilt in the jobs they left. While Vanderbilt argues that "the Kildea decision has no relevancy to the issues before the Court" because "[t]he issue in Kildea was whether laid off employees with a 'reasonable expectation' of recall were 'affected employees,'" (Docket No. 81 at 4), it is relevant in the sense that the Court's concern is with whether the 279 individuals were employed by Vanderbilt, and hence "employees," after September 2013.

The conclusion the Court reaches is also in keeping with the Sixth Circuit's recognition that "[c]ourts addressing § 2101(a)(6), whether in the context of a sale, plant closing, or mass layoff, have all applied a 'practical, effects-driven analysis of whether a break in employment actually occurred' to trigger the notification requirements of the WARN Act." Wiltz v. M/G Transport Serv., Inc., 128 F.3d 957, 964 (6th Cir. 1997) (quoting Gonzalez v. AMR Servs. Corp., 68 F.3d 1529, 1531 (2nd Cir. 1995)). The "practical, effects-driven analysis" looks not at the "employer's intent," but instead "examines consequences, such as whether 50 or more employees[3] lost their jobs." Phason v. Meridian Rail Corp., 479 F.3d 527, 531 (7th Cir. 2007); see also, New York Health and Human Serv. v. Grossman, 2007 WL 2907386, at *21 (E.D.N.Y. Oct. 3, 2007) (the practical effects "analysis requires the court to consider as a practical matter, whether a break in employment actually

---

[3] Gonzalez's reference to "50 or more employees" is not happenstance. The WARN Acts aggregation rule allows for an aggregation of 50 employees that constitute at least 33 percent of the workforce, or 500 employees. 29 U.S.C. § 2102(d).

7

occurred").

Here, the consequence of Vanderbilt sending the employees home on September 17, 2013, with the admonition to never return, was that those 279 people lost their jobs that day. This was the practical effect, given that those individuals could do whatever they wanted from that point forward. In fact, they were free to take a job with another employer the very next day.

The fact that the 279 individuals could go to work for another employer yet still receive "paid leave" is one of several factors which distinguish this case from Long v. Dunlop Sports Group of Americas, Inc., 506 F.3d 299 (4th Cir. 2008), a non-controlling case on which Vanderbilt heavily relies. At issue in Long was whether the employer, who had provided WARN Act notice and agreed to pay its employees for 60 days, was required to continue to pay 22 employees who found another job during the 60-day period. It was solely in that context that the Fourth Circuit held that "[w]hen an employer commits to continue payment of wages and benefits to its employees, the employment relationship has not ended." Id. at 303 (citation omitted).

Importantly, and as this Court pointed out in its prior ruling on Vanderbilt's Motion to Dismiss,

> Defendant's reliance on Long might have some purchase if Plaintiff was attempting to assert a damages claim on behalf of those employees who were terminated during the second wave of layoffs. She does not. Rather, the essence of her claim is that Defendant "manipulat[ed] [the] layoff time-frames to game the system and avoid WARN Act coverage when conducting mass layoffs." (Docket No. 53 at 10). Long's concern was not about the aggregation rule and it simply did not address the present scenario.

(Docket No. 57 at 8-9).

In this regard, Vanderbilt's argument that "the purpose of WARN is to provide advance notice to workers and their families to provide 'transition time to adjust to the prospective

8

employment loss [and] to seek and obtain alternative jobs, 29 C.F.R. § 639.1(a),'" (Docket No. 81 at 2) is undoubtedly correct, and its argument that it "complied with the purpose and the spirit of WARN" because it provided the 279 individuals advanced notice and 60 days pay, is likely also correct. But both arguments ignore the issue here – whether the employees who were terminated on July 1, 2013 were entitled to notice.

The regulations instruct employers to "[l]ook ahead 90 days and behind 90 days to determine whether employment actions both taken and planned each of which separately is not of sufficient size to trigger WARN coverage will, in the aggregate for any 90-day period, reach the minimum numbers for a plant closing or a mass layoff and thus trigger the notice requirement." 20 C.F.R. § 639.5(a)(1)(ii). This look-ahead/look-back requirement, coupled with the aggregation provision, helps "prevent the evasion of the statute by the manipulation of the numbers of employees laid off." Roquet v. Arthur Anderson LLP, 2003 WL 21251979, at * 6 (N.D. Ill. May 27, 2003); see also, United Mine Workers of Am. v. Martinka Coal Co., 202 F.3d 717, 723 (4th Cir. 2000) ("to avoid manipulative employment actions at a given plant, the Act provides an aggregating mechanism").

This Court's conclusion that the 279 employees suffered an employment loss on or around September 17, 2013, means that the second wave of layoffs occurred approximately 78 days after the first. As such, the class members in this case should have received notice under the WARN Act, unless the two rounds of layoffs were "the result of separate and distinct actions and causes and . . . not an attempt by [Vanderbilt] to evade the requirements" of the WARN Act. 29 U.S.C. § 2102(d).

### III. Settlement Agreement

In conjunction with Defendant's Motion for Summary Judgment, Plaintiff filed an

9

"Unopposed Motion for Preliminary Approval of Settlement" with an accompanying proposed Order. (Docket No. 73). Additionally, the parties filed a Release and Settlement Agreement. (Docket No. 75).

In the Release and Settlement Agreement, the parties agree that if this Court "resolves Defendant's summary judgment motion in Plaintiff's favor, and thereby determines that the 279 employees who received notification of the elimination of their positions in September 2013 suffered an 'employment loss' in September 2013, the parties stipulate that a final judgment should be entered awarding damages in the aggregate amount of $285,000 to the class members[.]" (Id. at 4). They also agree that $135,000 should be awarded "to class counsel as reimbursement for their attorney's fees and for the litigation expenses they have advanced." (Id.). Finally, they agree that "Defendant shall then be permitted to appeal the Court's final judgment at Defendant's choosing." (Id.).

While entry of final judgment in Plaintiff's favor on the amount requested has some facial appeal, Rule 23 of the Federal Rules of Civil Procedure requires a hearing and a finding that the settlement is "fair, reasonable, and adequate," Fed. R. Civ. P. 23(e)(2), and involves consideration of various factors, Moulton v. U.S. Steel Corp., 581 F.3d 344, 349 (6th Cir. 2009). The Court has not yet held a fairness hearing and rather than entering judgment for a sum certain, the Court will enter partial judgment in accordance with Rule 54(b) on Plaintiff's claim that the 279 Vanderbilt employees suffered and "employment loss" for purposes of the WARN Act on or around September 17, 2013.

"Rule 54(b) is designed to promote efficiency by allowing the district court to certify a claim for interlocutory appeal where the claim is wholly distinct from the remaining claims given the

'aggregate of operative facts.'" Advanced Concrete Tools, Inc. v. Beach, 525 F. App'x 317, 322 (6th Cir. 2013). "Proper certification under Rule 54(b) is a two-step process[:] '[f]irst, the district court must expressly direct the entry of final judgment as to one or more but fewer than all the claims or parties in a case [and] [s]econd, the district court must expressly determine that there is no just reason to delay appellate review.'" Planned Parenthood Sw. Ohio Region v. DeWine, 696 F.3d 490, 500-01 (6th Cir. 2012) (quoting Gen. Acquisition, Inc. v. GenCorp, Inc., 23 F.3d 1022, 1026 (6th Cir. 1994)). With regard to the second prong, the Court considers "a nonexhaustive list of factors, such as: (1) the relationship between the adjudicated and non-adjudicated claims; (2) the possibility that the need for appellate review might become moot due to future developments in the district court; (3) the possibility that the appellate court might be required to hear the same issue twice; (4) the presence or absence of a claim or counterclaim that might result in a set-off against the final judgment; and (5) other miscellaneous factors, including 'delay, economic and solvency considerations, shortening the time of trial, frivolity of competing claims, expense, and the like.'" U.S. Citizens Ass'n v. Sebelius, 705 F.3d 588, 596 (6th Cir. 2013) (quoting, Corrosioneering, Inc. v. Thyssen Envtl. Sys., Inc., 807 F.2d 1279, 1283 (6th Cir. 1986).

None of the relevant factors point to a just reason for delaying appellate review. Plaintiff's entire WARN Act case hinges on whether the 297 individuals were Vanderbilt employees after September 17, 2013, as does the settlement. Save for a possible fairness hearing on the proposed settlement, nothing further is to be done in this Court, and the only basis for an appeal is the Court's conclusion about when an "employment loss" occurred.

Although the Court will not enter a final judgment which incorporates the agreed amounts to be paid to counsel and the class, the Court will grant Plaintiff's Unopposed Motion for Settlement

11

approval. The Court will, however, withhold entering the proposed Order, which sets forth the timing and the sending of notice and the date for a fairness hearing, until after an appeal has been completed, or the time for appeal has expired.

## IV. Conclusion

On the basis of the foregoing, Defendant's Motion for Summary Judgment will be denied. The Court will enter judgment pursuant to Rule 54(b) on Plaintiff's claim that an employment loss occurred on September 17, 2013. Finally, Plaintiff's Motion for Settlement Approval will be granted.

An appropriate Order will be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE